UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Robert B. Kugler |
| | : | |
| v. | : | Crim. No. 07-459 (RBK) |
| | : | |
| MOHAMAD IBRAHIM SHNEWER, | : | |
| DRITAN DUKA, | : | |
|  a/k/a "Distan Duka," | : | |
|  a/k/a "Anthony Duka," | : | |
|  a/k/a "Tony Duka," | : | |
| ELJVIR DUKA, | : | |
|  a/k/a "Elvis Duka," | : | |
|  a/k/a "Sulayman," | : | |
| SHAIN DUKA, | : | |
| SERDAR TARTAR, and | : | |
| AGRON ABDULLAHU | : | |

---

**MEMORANDUM OF LAW OF THE UNITED STATES IN SUPPORT OF MOTION FOR AN ANONYMOUS JURY**

---

CHRISTOPHER J. CHRISTIE
United States Attorney
970 Broad Street
Newark, New Jersey 07102

On the Memorandum:

William E. Fitzpatrick
Deputy United States Attorney
R. Stephen Stigall
Norman Gross
Assistant United States Attorneys
Camden Federal Building &
  U.S. Courthouse
401 Market Street, 4th Floor
Camden, New Jersey 08101
(856) 757-5030

**PRELIMINARY STATEMENT**

The Government requests that this Court impanel an anonymous jury in this case, in which the Court and the court officers would not disclose to the parties or to any third person the names, home addresses, and business or work addresses or other contact or identifying information (such as telephone numbers) of any of the prospective jurors who are summoned for petit jury service in this case. Third Circuit law, as well as the law of all other Courts of Appeal that have addressed the issue, expressly authorizes the impanelment of anonymous juries in criminal cases such as this one, where there is: (a) extensive media coverage of the proceedings; (b) the defendants are charged with crimes of violence (here, conspiracy to commit mass murder) and the use of firearms; (c) the defendants are facing very long prison sentences, thereby providing them and their ideological supporters with a powerful incentive to interfere with the judicial process; and (d) the nature of the charged crimes are such that they might reasonably cause a prospective juror to be concerned about their own safety or the safety of their family.

Additionally, this Court has authority to undertake a host of prophylactic measures that will minimize if not dispel the risk that impaneling an anonymous jury will cause any prejudice to the defendants. Because there are substantial reasons to impanel an anonymous jury in this case, and no good reason not to, the United States respectfully request than an anonymous jury be impaneled.

**FACTUAL SUMMARY AND PROCEDURAL HISTORY**[1]

On or about January 3, 2006, defendants Mohamad Ibrahim Shnewer, Dritan Duka, Eljvir Duka, Shain Duka, Serdar Tartar, Agron Abdullahu, and four other men conducted firearms training in the Pocono Mountains of Pennsylvania.  A digital video disk ("DVD") of that training came into the possession of law enforcement officials.  It shows the men shooting assault weapons at a firing range in a militia-like style while calling for *jihad* and shouting in Arabic "Allah Akbar" ("God is Great").  Investigation by Immigration and Customs Enforcement established that Dritan Duka, Eljvir Duka, and Shain Duka (who are brothers) were illegally residing in the United States.  Accordingly, federal law prohibits them from even possessing firearms, much less using them.  See 18 U.S.C. § 922(g)(5).

A sixteen month investigation conducted by the Federal Bureau of Investigation ("FBI") and Joint Terrorism Task Force ("JTTF") revealed that the Duka brothers, along with their co-defendants Mohamad Ibrahim Shnewer and Serdar Tatar, share radical Islamic and jihadist beliefs.  This is evidenced by, among other things, the fact that the Duka brothers and Shnewer acquired, distributed and/or viewed DVDs and videos which depicted violent attacks on United States military personnel, which espoused jihadist propaganda produced by al Qaeda and

---

[1] The facts set forth herein are offered as a general summary of the aspects of the government's case relevant to this motion, and not as a complete recitation of the government's evidence.

others, and which attempted to recruit the viewer to engage in armed attacks against the United States Government.[2]

In addition, several of the defendants have expressed to persons working as confidential informants for law enforcement agencies their intent to engage in armed paramilitary style attacks on United States military facilities in New Jersey and elsewhere, and to kill the military service personnel who are present at those facilities.  The investigation also revealed that some of the defendants have recruited and attempted to recruit others to radical Islamic theology, and have conducted small arms training using handguns, shotguns, and semi-automatic assault weapons, conducted tactical exercises using paint-ball devices, conducted surveillance operations at several federal facilities, obtained a detailed map of the Fort Dix facility, and have attempted to obtain additional weaponry to carry out their attacks.

Agron Abdullahu supplied weapons to several of the other conspirators, which they used during firearms training. Abdullahu also stored the weapons because he and the Duka brothers knew that the Duka brothers could not legally possess firearms.

In or about the middle of January 2007, the conspirators

---

[2] Al Qaeda is a foreign terrorist organization which sponsored, managed and financed terrorist attacks against the United States and its citizens, including the terrorist attacks of September 11, 2001 and attacks on United States military forces fighting in Iraq and Afghanistan.

agreed to return to the Pocono Mountains in order to conduct additional firearms training.  The defendants rented a house in Gouldsboro, Pennsylvania, near the site of the original January 2006 firearms training, for the week of February 1, 2007.

In preparation for the trip, some of the conspirators spent the night of January 31, 2007 at Dritan Duka's home in Cherry Hill, New Jersey, and then left together for the Poconos early the next morning.  Between January 31, 2007 and February 1, 2007, law enforcement officers conducted surveillance of Dritan Duka's residence.  During the night of January 31, 2007, agents observed, among other things, Agron Abdullahu bring an SKS semi-automatic rifle and a 9 millimeter Beretta handgun from a vehicle into Dritan Duka's residence.  Agents also watched as Agron Abdullahu and Dritan Duka carried two rifle style bags from a vehicle into the Duka residence.  During the morning of February 1, 2007, agents observed Agron Abdullahu, with the aid of Shain Duka, take four weapons from Dritan Duka's residence and load them into Abdullahu's vehicle.  Finally, agents watched as the Duka brothers, Agron Abdullahu, and others left the Duka residence en route to Gouldsboro, Pennsylvania in possession of at least four weapons.

On or about February 2, 2007, law enforcement officers conducting surveillance at Pennsylvania State Game Land 127 - the same firearms range shown on the January 3, 2006 DVD described above - observed the Duka brothers firing an SKS semi-automatic rifle, a Beretta Storm semi-automatic rifle, a Mossberg 12 gauge

4

pump shotgun, and a 9 millimeter Beretta handgun.  Law enforcement officers also observed Abdullahu directing others where to place the shotgun when firing it.

On February 4, 2007, Mohamad Shnewer and a cooperating witness arrived at the rental house in the Poconos.  The cooperating witness recorded the events that occurred that evening in the rental house, which included Shnewer displaying videos - which members of the group referred to as Mujahideen and terrorist training videos - on his laptop computer.  Members of the group pointed out that United States military vehicles were shown being destroyed in various attacks.  Shain Duka pointed out that a United States Marine's arm had been blown off, at which point laughter erupted from the group.  In the early hours of February 5, 2007, several members of the group discussed bombs, nitroglycerin, and the explosive C-4.  Abdullahu later discussed his knowledge about making explosives.

After the conspirators returned from the Pocono Mountains, Dritan Duka and Mohamad Shnewer attempted to purchase fully-automatic AK-47 machine guns, fully-automatic M-16 machine guns, and other weapons from a cooperating witness' "source" of weapons.  Dritan Duka, Mohamad Shnewer and the cooperating witness selected May 7, 2007 as the date when Dritan Duka and Shnewer would take delivery of the weapons they had ordered.

On the evening of May 7, Dritan and Shain Duka arrived at the location in Cherry Hill where the delivery of the weapons was to take place.  Then and there, Dritan and Shain Duka possessed

and attempted to possess three AK-47 fully-automatic machine guns and four fully-automatic M-16 machine guns.  Law enforcement officials then arrested Dritan and Shain Duka pursuant to criminal complaints and arrest warrants issued by United States Magistrate Judge Joel Schneider.

Also on May 7, 2007, other law enforcement officials arrested Mohamad Shnewer, Eljvir Duka, Serdar Tartar, and Agron Abdullahu pursuant to federal criminal complaints and arrest warrants issued by Judge Schneider.  Following his arrest, Abdullahu waived his <u>Miranda</u> rights and agreed to be interviewed by law enforcement officials.  Abdullahu admitted, in substance and in part, that he provided one SKS semi-automatic rifle and one 9 millimeter Beretta handgun to the Duka brothers knowing that they were prohibited from possessing firearms.  In addition, Abdullahu stated, in substance and in part, that on or about January 31, 2007, he and Shain Duka traveled from New Jersey to Pennsylvania in order to take possession of one Mossberg 12 gauge pump shotgun and one 9 millimeter Beretta Storm semi-automatic rifle from an associate of the Dukas.  All of those guns were used during the January 2006 and February 2007 firearms training trips in the Poconos.

In addition to interviewing Abdullahu on the evening of May 7, 2007, law enforcement officers also searched his residence pursuant to a search warrant issued by the Court, and seized, among other things, one SKS semi-automatic rifle, one Beretta Storm semi-automatic rifle, one Mossberg 12 gauge pump shotgun,

and one 9 millimeter Beretta handgun, as well as ammunition.

On June 5, 2007, a grand jury sitting in Camden, New Jersey returned a five count indictment.  The indictment charged all defendants, except Abdullahu, in Count 1 with conspiracy to murder members of the United States military, contrary to 18 U.S.C. § 1114, in violation of 18 U.S.C. § 1117.  Dritan and Shain Duka were charged in Count 2 with unlawful possession of a machine gun, in violation of 18 U.S.C. § 922(o).  In Count 3, Dritan and Shain Duka were charged with unlawful possession of firearms (the machine guns they purchased on May 7, 2007) by aliens who were unlawfully residing in the United States, in violation of 18 U.S.C. § 922(g)(5).  In Count 4, Dritan, Eljvir, and Shain Duka were charged with unlawful possession of four other firearms, possessed from January 31 to February 1, also in violation of 18 U.S.C. § 922(g)(5). Finally, Abdullahu alone was charged in Count 5 with aiding and abetting Dritan, Elvir, and Shain Duka in their unlawful possession of firearms, in violation of 18 U.S.C. § 2 and 922(g)(5).

**ARGUMENT**

In the leading case of <u>United States v. Scarfo</u>, 850 F.2d 1015 (3d Cir. 1988), the Court of Appeals affirmed the district court's impanelment of an anonymous jury in a prosecution for Hobbs Act extortion and related offenses. The Court of Appeals observed that:

> Juror's fears of retaliation from criminal defendants are not hypothetical; such apprehension has been documented. No doubt similar reactions in unreported cases have occurred. As judges, we are aware that, even in routine criminal cases, veniremen are often uncomfortable with disclosure of their names and addresses to a defendant. The need for such information in preparing an effective defense is not always self-evident. . . . Because the system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than an anathema to, the jury concept. In short, we believe that the probable merits of the anonymous jury procedure are worthy, not of a presumption of irregularity, but of disinterested appraisal by the courts.

850 F.2d at 1023 (internal citations omitted).

Anonymous juries are impaneled in district courts throughout the country to protect the integrity of trials and to ensure juror impartiality. <u>United States v. Wong</u>, 40 F.3d 1347, 1376-77 (2d Cir. 1994).[3] Impaneling an anonymous jury "is not

---

[3] There is statutory support for the use of anonymous juries. 28 U.S.C. § 1863, which requires district courts to establish local plans for the random selection of jurors, provides in pertinent part, that the court must:

> (7) fix the time when the names drawn from the qualified jury wheel shall be disclosed to parties and to the public. If the plan permits these names to be made public, it may nevertheless permit the chief judge of the district court, or such other district court
> (continued...)

8

intrinsically suggestive of any inference of guilt." Scarfo, 850 F.2d at 1026. "If measures are taken to inform a defendant of jury demographics and to permit ample voir dire, an anonymous jury need not impair a defendant's right to intelligently exercise peremptory challenges." United States v. Eufrasio, 935 F.2d 553, 574 (3d Cir. 1991); Scarfo, 850 F.2d at 1022-23.[4]

Nor is the district court required to hold an evidentiary hearing in order to justify a decision to impanel an anonymous jury. Eufrasio, 935 F.2d at 574. This is because the

> trial judge is usually well-aware of the ambience surrounding a criminal trial and the potential for juror apprehensions. Publicity surrounding [a particular] prosecution[] may well have raised . . . juror apprehensions for their own safety, and a corresponding desire on the part of the judge to ease that tension. In such a situation, an anonymous jury is justified, as long as defendants are afforded full voir dire.

Id.

Owing to the district court judge's first-hand and in-depth awareness of the "ambience" of the criminal case, the decision to impanel an anonymous jury lies within the discretion of the

---

[3](...continued)
judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require.

28 U.S.C.A. § 1863 (b)(7). This provision has been cited as authority to impanel an anonymous jury in a particular case. United States v. Ochoa-Vasquez, 428 F.3d 1015, 1033, n. 24 (11th Cir. 2005).

[4] Citing Eufrasio and Scarfo, the District Court impaneled an anonymous jury even where the defendants, who were detained during trial, were charged with economic rather than violent crimes. See, e.g., United States v. Harris, et al., No. 03-354 (JBS)(D.N.J. filed 6/4/04).

district court, provided that the court's discretion is grounded in legitimate concerns for juror safety, courtroom security and protecting court proceedings from outside influences. United States v. Thornton, 1 F.3d 149, 154 (3d Cir. 1993); United States v. Childress, 58 F.3d 693, 703 (D.C. Cir. 1995) (applying deferential review because "some of the relevant factors, such as the degree of menace presented by the defendants and the intensity of media interest, may be only incompletely captured in the written record, so that courts of appeal are particularly ill-equipped to second-guess these judgments").[5]

In determining whether an anonymous jury is warranted, this Court should consider: (1) pretrial publicity that may contribute to juror apprehension; (2) any history of violence by the defendants; (3) the severity of the charges and possible prison sentences facing the defendants; and (4) any evidence that a defendant previously intimidated witnesses. Id. at 154; Scarfo, 850 F.2d at 1023-1024. Also pertinent is whether a criminal organization with which a defendant is affiliated has the means and/or predilection to interfere with the jury. United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985). No single factor is dispositive; rather, the court must consider the "totality of the circumstances." United States v. Shryock, 342 F.3d 948, 970-71 (9th Cir. 2003); United States v. Brown, 303 F.3d 582, 602 (5th

---

[5] Indeed, "[e]very circuit that has addressed this issue has held that a lower court's decision to impanel an anonymous jury is entitled to deference and is subject to abuse of discretion review." United States v. Shryock, 342 F.3d 948, 970-71 (9th Cir. 2003) (collecting cases).

Cir. 2002); United States v. Ross, 33 F.3d 1507, 1521 n.26 (11th Cir. 1994).  The Court need not find the presence of all or even most of these factors to impanel an anonymous jury, one or two may be sufficient.  United States v. Fernandez, 388 F.3d 1199, 1244 (9th Cir. 2004) ("these factors are neither exclusive nor dispositive"), modified on other grounds, 425 F.3d 1248 (9th Cir. 2005); United States v. Darden, 70 F.3d 1507, 1532 (8th Cir. 1995) (collecting cases); United States v. Barnes, 604 F.2d 121, 141-42 (2d Cir. 1979) (extensive pretrial publicity and abundant allegations of dangerous and unscrupulous conduct were sufficient); but cf. United States v. Sanchez, 74 F.3d 562 (5th Cir. 1996) (finding impanelment of anonymous jury was reversible error where none of pertinent factors were present; fact that the defendant was a police officer was insufficient).

Here, several of the considerations that militate in favor of an anonymous jury are undeniably present.  There has already been extensive local and even national media attention surrounding this case; much more of the same will almost certainly follow.[6]  Heightened media interest strongly supports impanelment of an anonymous jury, in order to limit the intrusion of reporters into the private spheres of the jurors.  Brown, 303 F.3d at 602 ("enormous local and national publicity surrounding

---

[6] A query of Google on June 27, 2007 retrieved 817 media articles that were published since the arrest of these defendants on May 7-8, 2007 in which the words "Fort Dix" and "terrorists" appeared.  Thirty-one of those articles appeared in the New York Times alone.  Appended collectively hereto as Exhibit A are ten of the articles that focused on the criminal conduct and charges involved in this case.

11

the case" militated in favor of ordering an anonymous jury); United States v. Dakota, 197 F.3d 821, 827 (6th Cir. 1999) (affirming impaneling "a partially anonymous jury in order to minimize the prejudicial effects of pretrial publicity and an emotional, political atmosphere that created a risk of jury intimidation and improper influence"); United States v. Wong, 40 F.3d 1347, 1377 (2d Cir. 1994) ("The prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment.").

 A second factor supporting an anonymous jury is the nature of the charged conspiracy in this case: a protracted plot to systematically collect firearms and other weapons, engage in paramilitary training, surveil and obtain information about military installation targets, all with the goal of killing United States military service personnel in an attack motivated by jihadist ideology.  That factor weighs in favor of an anonymous jury for several reasons.  First, the charged crimes involve violent attacks against wholly innocent persons, showing a complete disregard for the sanctity of human life.  See Shryock, 342 F.3d at 972 (anonymous jury justified where "the record shows Appellants' involvement on behalf of the Mexican Mafia in several murders, attempted murders, and conspiracies to commit murder").

 Second, the defendants' plot to murder military personnel was motivated by political and religious ideology.  Prospective jurors reasonably might fear that anyone who is willing to engage

in potentially suicidal attacks on armed military personnel inside a fortified military base in order to further a politically or religiously inspired agenda to attack the United States government would have few qualms about injuring or threatening to injure jurors selected to decide their guilt or innocence.

Third, the charged crimes include the unlawful possession and acquisition of firearms, including fully automatic machine guns, the raison d'etre of which are to kill many people in a short period of time. The defendants also discussed the manufacturing of explosive devices.

Fourth, even though the defendants themselves are disabled, by virtue of their detention, from personally interfering with or threatening the jurors, prospective jurors reasonably might fear that they enjoy support from like-minded persons who share their jihadist views, and who might be willing to disrupt the trial in this case by interfering with or intimidating the jurors. See Childress, 58 F.3d at 703 (anonymous jury was justified because the criminal organization with which the defendants were affiliated "retained the capacity to threaten and harm jurors, even though its highest leaders were in jail"); United States v. Wong, 40 F.3d 1347, 1377 (2d Cir. 1994) (citing risks posed by non-defendant fellow gang members to justify anonymous jury); United States v. Vario, 943 F.2d 236, 240, 241 (2d Cir.1991) (noting the "demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his

13

behalf" justified anonymity); United States v. Talley, 164 F.3d 989, 1002 (6th Cir. 1999) (affirming the deployment of an anonymous jury, even though there was no evidence that the defendant was personally involved in a criminal organization that included a pattern of violence, or had ever attempted to tamper with any previous juries, where the defendant's "many years of law enforcement experience provided him with the types of contacts that would enable him to tamper with the jury"). Jihadist groups, motivated by an ideology that supports violent attacks on institutions and facilities of the United States Government, are virtual exemplars of organizations that a reasonable juror would fear.

There is abundant evidence that the defendants fully subscribed to al Qaeda's jihadist ideology. Jurors who are asked to sit in judgment of these defendants could reasonably fear retaliation from at-large sympathizers of al Qaeda, regardless of whether or not retaliation is actually in the works.

A final factor supporting the selection of an anonymous jury is that the defendants are facing the possibility of lengthy prison sentences, creating a powerful incentive to threaten a juror. Shryock, 342 F.3d at 970-97. Here, the maximum sentence for any of the defendants convicted of Count 1 is life imprisonment. See 18 U.S.C. §§ 1114 and 1117. In addition, the advisory Guideline range, if convicted, is likely to recommend life imprisonment. See U.S.S.G. §§ 2A1.5 and 3A1.4.

Consideration of all of these factors together fully

supports deployment of an anonymous jury.  United States v. Stewart, 325 F. Supp.2d 474, 498-500 (D. Del. 2004) (impaneling an anonymous jury where the defendant was charged with distributing more than 40 kilograms of cocaine, assault, weapons possession and escape; there was evidence that the defendant had engaged in violence against law enforcement personnel; there was substantial media attention to the case; and there was evidence that the defendant had attempted to intimidate witnesses).

The use of an anonymous jury does not infringe upon a defendant's constitutional right to be tried by a fair and impartial jury so long as the Court conducts a careful voir dire designed to uncover any bias against the defendants.  As an additional precaution, the Court should give the prospective jurors a plausible and non-prejudicial reason for not disclosing their identities.  United States v. Ochoa-Vasquez, 428 F.3d 1015, 1035 (11th Cir. 2005) ("the threat to a defendant's presumption of innocence is minimized when the trial court gives the jurors a plausible and nonprejudicial reason for hiding their identities.") (internal quotation marks omitted).  In this regard, courts have routinely stressed to the jurors the need to prevent the media from interfering with the jurors' privacy.  Id. at 1037, n. 29 (collecting cases); Fernandez, 388 F.3d at 1245 ("the district judge was careful to offer neutral justifications for the jury's anonymity that focused on juror confidentiality and suggested that such procedures are routine"); Shryock, 342 F.3d at 973 ("the district court instructed the jury that the use

15

of anonymous juries was commonplace in federal court, and that the reasons for the use of such a jury here had nothing to do with the Appellants' guilt or innocence"); United States v. Darden, 70 F.3d at 1533 (no prejudice where the court gave a neutral explanation for anonymity and conducted voir dire adequate to uncover juror bias); United States v. Paccione, 949 F.2d 1183, 1193 (2d Cir. 1991) (instructions at the outset of the trial that anonymity was designed to protect the jury from media contact prevented prejudice).  The instruction should inform the jury that anonymity is a routine occurrence in federal court. "By instructing jurors that the use of an anonymous jury was routine, the district court avoided the possibility that jurors would view the procedure as an extraordinary precaution signaling a threat from the defendants and, inferentially the defendants' guilt."  United States v. Edmond, 52 F.3d 1080, 1093 (D.C. Cir. 1995); accord United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989) (holding an identical instruction "sufficient to ensure that the jury would not draw improper conclusions from the preservation of their anonymity").

    Additionally, the Court should solicit submissions from the defendants regarding the voir dire questions to be posed to the potential jurors, and permit the defendants to suggest modifications to any proposed questions offered by the Government and the Court.  United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994) (district court "fashioned, with the input of counsel, a 68-question juror questionnaire designed to elicit pertinent

16

information as to possible bias [and] made extensive inquiries into the jurors' personal backgrounds"). Without disclosing their names or home and work addresses, the venire members can be required to disclose the general area where they live, their occupations, and the nature of their work. See United States v. Branch, 91 F.3d 699, 724-25 (5th Cir. 1995) (upholding anonymous jury where the court conducted a searching voir dire and gave jurors an extensive questionnaire); Childress, 58 F.3d at 704 (same). These measures will dispel any possible harm to the defense from the selection of an anonymous jury.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court impanel an anonymous jury in this case.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney

**/s William E. Fitzpatrick**
**/s R. Stephen Stigall**
**/s Norman Gross**

By: WILLIAM E. FITZPATRICK
Deputy U.S. Attorney
R. STEPHEN STIGALL
NORMAN GROSS
Assistant U.S. Attorneys

Date: July 9, 2007
      Camden, New Jersey